**720-15**

Petition for Discretionary Review

To the Honorable Court of Criminal Appeals of Texas

**ORIGINAL**

June 5, 2015

Hon. Ricardo P. Rodriguez
Hidalgo county District Attorney
100 N. Closner
Edinburg, TX 78539

Carlos Eduardo Ortegon
Attorney at Law
6521 N. 10th St., Ste. F
McAllen, TX 78504

Hon. Luis A. Gonzalez
Hidalgo County Courthouse
Assistant District Attorney
100 N. Closner
Edinburg, TX 78539

Hon. Oscar Rene Flores
Attorney at Law
1308 South 10th Ave.
Edinburg, TX 78539

Nereyda Morales Martinez
Attorney at Law
1112 S. McColl, Suite 1
Edinburg, TX 78539

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUN 12 2015

Abel Acosta, Clerk

Re:      Cause No. 13-12-00603-CR
Tr.Ct.No.   CR-003-11-E
Style:  Ricardo Munoz Sanchez AKA Ricardo Alonso Sanchez V. The
        State of Texas

        Enclosed please find Appellant's petition for discretionary
        review, filed by the Appellant.

                              Sincerely,

                              (Appellant)

trial court judge:Judge Juan Ramon Partida,  275th District
                  Court, Hidalgo County
                  Hon. Laura Hinojosa, District Clerk
                  Hon. J. Rolando Olvera Jr., Presiding Judge,
                  5th Administrative Judicial Region

# Table of Contents

Identity of Parties and Counsel................................i

Table of Contents..............................................ii

Index of Authorities..........................................iii

Notes as to the Form of Citation..............................iv

Statement Regarding Oral Argument..............................v

Statement of the Case.........................................vi

Statement of Procedural History..............................vii

Grounds for Review...........................................viii

Argument One a) Miscontrued Case Law...........................1

Argument  b) Court departed from course of law..............1,2

Argument  c) Misconstrued Case Law..........................2,3

Argument Two (Admision of prejudice evidence)..................3

Prayer for Relief..............................................4

Appendix.......................................................5

# Index of Authorities

## Statutes

Section 7.01 O'Connor's Texas Criminal Codes Plus(2012-13)...1

Section 7.02 O'Connor's Texas Criminal Codes Plus(2012-13)...1

Tex. R. Crim. Evid. 403.................................3

## Cases

Ethridge, 795 S.W.2d 596, 598..........................1

Gordon v. State, 735 S.W.2d 510, 517 (Tex. App. -Houston)....3

Hooper v. State, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)..2

State v. Mehler, 153 S.W.3d 435, 440 (Tex, Crim. App. 2005)..3

Torres v. State, 794 S.W.2d 596, 598 (Tex. App.-Austin 1990).1

**Notes as to form of Citation**

A) Citation to testimony in the Reporter's Record will be to volume number, Reporter's Record, then the page number(s), e.g. 2RR11 refers to volume 2 of the Reporter's Record, pg.11

B) Reference to the Thirteenth Court of Appeals Memorandum Opinion will be to the page number, e.g. 13th C. App. Opinion pg.21

## Statement Regarding Oral Argument

Appellant Sanchez is not requesting oral argument at this time.

To the Honorable Justices of the Court of Criminal Appeals:

Appellant,Ricardo Munoz Sanchez, files this petition for discretionary review requesting that it be considered and granted

## Statement of the Case

Appelant was indicted in count one with the offense of capital murder.(2RR11) Appellant pleaded 'Not Guilty'. A jury found Appellant guilty of capital murder, as charged in the indictment, (33RR80)and was assessed the automatic punishment of LIFE imprisonment in the Institutional Division of the Texas Department of Criminal Justice without the possibility of parole.(33RR89) Appellant apealed and the Thirteenth Court of Appeals affirmed. Appellant now, timely files petition for discretionary review.

**Statement of Procedural History**

Number 13-12-00603-CR
Trial Cause No. CR-003-11-E
Ricardo Munoz Sanchez A/K/A                                      Appellant,
Ricardo Alonso Sanchez,

                                        V.

The State of Texas                                              Appellee.

On May 14, 2015, The Thirteen Court of Appeals having considered
the cause on appeal, concluded that the judgement of the trial
court should be AFFIRMED.
        No motion for rehearing was filed in this case.

## Grounds for Review

1) The evidence is insufficient to show that Appellant Sanchez, either as a principal, a party, or a co-conspirator, intentionally and knowingly caused the death of Reyes Garcia, Jr., by shooting him with a firearm while committing or attempting to commit the offense of robbery and/or burglary of a building

   a) Court misconstrued case law; Torres v. State, 794 S.W.2d 596, 598(Tex. App. -Austin 1990)(13th C. App. Opinion pg.23.

   b) Court of Appeals departed from the accepted and usual course of law: (13th C. App. Opinion pg.23)

   c) Court misconstrued case law: Ethridge, 795 S.W.2d. at 285. Gordon v. State, 735 S.W.2d. 510, 517(Tex. App.-Houston) (13th C. App. Opinion pg. 24)

2) Admission of State's Exhibit 8,was unfairly prejudice towards Appellant Sanchez. (27RR56-66)

**Argument**

**Ground No. 1**

1) Insufficiency of evidence as for <u>Sections</u> 7.01 & 7.02 O'Connor's <u>Texas Criminal Codes</u> Plus(2012-13)

    a) Appellant disagrees that his concern for the blood

        being found in the vehicle could have been taken as a

        'conscioasness-of-guilt' by the jury.(13th C.A. Opinion

        pg.23) (Citing Torres v. State, 794 S.W.2d. 596, 598

        Tex. App.-Austin 1990) Appellant was aware of his blood

        being in the vehicle,(See State's Ehibit 45,Trnscript/

        Translation of recorded phone call from Hidalgo County

        pp. 7-8) and Laurie Aleman, testified of the incident

        that led to the blood getting on the vehicle.(31RR64-65)

        It was only logical that Appellant showed concern,

        since evidence established that  prior to the call,

        Appellant had recently been interviewed by police regar-

        ding Garcia's murder.(13th C.App. Opinion pg 8.) Therfo-

        re, the Court erred in referring to Torres v. Sate, 794

        S.W.2d. 596-598 as an authority, and judgement is not

        supported by case law.

    b) The Court of Appeals departed from the accepted and usu

        al course of law by concluding that,"The combined force

        of the citied evidence lead to a reasonable inference

        that Appellant left the blood in the vehicle at the time

        that the crime occured."(See 13th C. App. Opinion pg.23)

        Referring to Hooper, 214 S.W.3d. 15.("under the test

of Jackson, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial") At trial there was no evidence presented for the jury to make a reasonable inference that the Appellant left the blood in the vehicle during the course of the crime. In the contrary, Investigator Ochoa, testified,"...as far as his right hand, a figurine that was broken when the suspects crossed over the fence in order to gain entrance into the property..."(13th C. App. Opinion pg. 21) Indicating that the cut occured during the entry of the property. If that was so, there would of been apparent blood found inside Garcia's home. Something Id. Technician, Cecilia Avila, did not find.(29RR76-90) Evidence was contrary to the courts findings.

c) Appellant believes it was irrevelant for the Court to cite Ethridge, 795 S.W.2d at 285; Gordon v. State, 735 S.W.2d. 510, 517 (Tex. App.-Houston 1987) providing that "appellant demonstrated a guilty mind by attempting to destroy incriminating evidence," when referring to the phone call Appellant made to Coco about the'toys'. (13th C. App. Opinion pg. 24) There was no evidence to show the "toys" was reffered to incriminating evidence, 'nor was there any evidence to prove that the weapons they found on Coco, had a connection with the Appellant. There was no testimony by Coco to connect the weapons found on him to the Appellant. Therfore, the citing

2

was irrevelant and the evidence failed to prove that the Appellant participated in the execution of the home invasion by soliciting, encouraging, directing, aiding or attempingto aid another person in commiting the crime in this case.(Tex. Penal Code Ann. §7.02(a)(2))

## Ground No. 2

2) Appellant disagrees that State's Exhibit 8, (the video recorded surveillance footage of the perpetrators entering the home of Reyes Garcia, Jr.) was more probative than prejudicial.

Tex. Rules of Evidence 403(1998) superseded 2015)(State v. Mehler, 153 S.W.3d. 435, 440(Tx. Crim. App. 2005) There was no evidence linking the appellant to the vehicle seen in the video. Inv. Dina Valdez also testified that the license plates were not visible in the video.(27RR90) The video was irrevelant to the appellant, and is proved to have been used as a "scare tactic" when District Attorney, Linda Castillo, stated in her closing argument, "This is what's going on in our streets."(33RR24-30) Referring to the video and the increasing rate of home invasions.

3

**Prayer for Relief**

Appellant Sanchez, prays that the Court of Criminal Appeals considers this petition and grants discretionary review.

Respectfully Submitted,

By: Ricardo Munoz Sanchez
T.D.C.No. 01814573
Bill Clements Unit
9601 Spur 591
Amarillo, TX 79107

4

Appendix

Number 13-12-00603-CR

Court of Appeals

Thirteenth District of Texas

Corpus Christi- Edinburg

Ricardo Munoz Sanchez,                                    Appellant,

                                        v.

The State of Texas,                                       Appellee.

On Appeal from the 275th District Court of Hidalgo County, Tx.

Memorandum Opinion

Before Chief Justice Baldez and Justices Rodriguez and Longoria
Memorandum Opinion by Chief Justice Valdez

A jury found appellant, Ricardo Munoz, guilty of capital murder. Appellant received a life sentence without the possibility of parole. By two issues, appellant contends that the evidence is insufficient and that the trial court improperly admitted a video into evidence. We Affirm.



NUMBER 13-12-00603-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

| | |
|---|---|
| RICARDO MUÑOZ SANCHEZ A/K/A<br>RICARDO ALONSO SANCHEZ, | Appellant, |
| **v.** | |
| THE STATE OF TEXAS, | Appellee. |

On appeal from the 275th District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

Before Chief Justice Valdez and Justices Rodriguez and Longoria
Memorandum Opinion by Chief Justice Valdez

A jury found appellant, Ricardo Muñoz Sanchez, a/k/a Ricardo Alonso Sanchez,

guilty of capital murder. *See* TEX. PENAL CODE ANN. § 19.03 (West, Westlaw through 2013

3d C.S.). Appellant received a life sentence without the possibility of parole. By two

issues, appellant contends that the evidence is insufficient and that the trial court improperly admitted a video into evidence. We affirm.

## I. SUFFICIENCY OF THE EVIDENCE

By his first issue, appellant contends that the evidence is insufficient to support his conviction for capital murder. Specifically, appellant argues that the evidence is insufficient "to show that [he] caused the death of [the victim]" and "to show that [he] solicited, encouraged, directed, aided or attempted to aid or that [he] entered into any agreement with anyone to commit the offense of robbery and/or burglary of a building."

### A. Standard of Review and Applicable Law

In a sufficiency review, we examine the evidence in the light most favorable to the prosecution to determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010). The fact finder is the exclusive judge of the facts, the credibility of witnesses, and the weight to be given testimony. *Brooks*, 323 S.W.3d at 899. We must resolve any evidentiary inconsistencies in favor of the judgment. *Id.*

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). As charged in this case, the offense of capital murder occurred if the person "intentionally commit[ted] the murder in the course of committing or attempting to commit . . . burglary [or] robbery. . . ." *See* TEX. PENAL CODE ANN. § 19.03. A person commits murder if he "intentionally or knowingly causes the death of an

2

individual." *Id.* § 19.02 (West, Westlaw through 2013 3d C.S.). A person commits the offense of burglary of a habitation if, without the consent of the owner, the person enters a habitation and commits or attempts to commit a felony, theft, or an assault. *Id.* § 30.02(a)(3); *see Reyes v. State*, 422 S.W.3d 18, 23–24 (Tex. App.—Waco 2013, pet. ref'd). "A person commits [the offense of robbery] if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 29.02 (West, Westlaw through 2013 3d C.S). A person commits a theft if "he unlawfully appropriates property with intent to deprive the owner of property." *Id.* § 31.03(a) (West, Westlaw through 2013 3d C.S.). Appropriation of property is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b)(1).

"Each party to an offense may be charged and convicted with the commission of the offense without alleging that he or she acted as the principal or accomplice." *Id.* § 7.01(b), (c) (West, Westlaw through 3d C.S.); *Hayes v. State*, 265 S.W.3d 673, 678–79 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). Under the law of parties, "[a] person is criminally responsible as a party to [capital murder] if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West, Westlaw through 2013 3d C.S.). In addition, a person is criminally responsible for the conduct of another for the offense of capital murder if "acting with intent to promote or assist the commission of [capital murder], he solicits, encourages, directs, aids, or attempts to aid the other person to commit [capital murder]." *Id.* § 7.02(a)(2). When determining whether the evidence is sufficient to support that a defendant participated as a party to a crime, we may consider "events occurring before,

3

during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *King v. State*, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000) (quoting *Ranson v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)). Under the law of parties, the defendant does not need to be physically present at the commission of the offense in order for the evidence to be sufficient. *See Guevara v. State*, 152 S.W.3d 45, 52 (Tex. Crim. App. 2004) (observing that the penal code "does not require that a party to the crime be physically present at the commission of the offense") (citing *Morrison v. State*, 608 S.W.2d 233, 234 (Tex. Crim. App. [Panel Op.] 1980)).

In our sufficiency review, "direct evidence of the elements of the offense is not required." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence, and juries are permitted to make reasonable inferences from the evidence presented at trial and in establishing the defendant's guilt. *Id.* "Circumstantial evidence alone can be sufficient to establish guilt." *Id.* "[T]he lack of direct evidence is not dispositive of the issue of a defendant's guilt." *Guevara*, 152 S.W.3d at 49. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013); *Ethridge v. State*, 795 S.W.2d 281, 284–85 (Tex. App.—Houston 1990) *pet. dism'd*, 812 S.W.2d 600 (Tex. Crim. App. 1990) (en banc).

B.    Law of Parties

4

It is undisputed that Reyes Garcia, Jr. died as a result of a gunshot wound after four masked men with guns entered his home on June 23, 2010 and took several of his guns. The State presented evidence through eyewitness testimony that the four men were involved in a home invasion, Garcia told the men that he did not have any more money, the men beat Garcia, shot him, and when they left the men took four of Garcia's guns. From this evidence, the jury could have found that the four men committed the offense of burglary by entering the home without the effective consent of the owner and committed a theft by taking Garcia's guns after shooting him. Moreover, the jury could have concluded that because one of the men shot Garcia in the head, he had the specific intent to kill Garcia. *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999) (en banc) (explaining that "specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result") (quoting *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986)).

The State acknowledges that it is unknown who actually pulled the trigger and shot Garcia but argues that the evidence is sufficient under the law of parties to show that appellant is guilty of capital murder. Appellant claims that the evidence failed to show that appellant caused Garcia's death, that appellant "solicited, encouraged, directed, aided, or attempted to aid" the men who committed the offense, or that appellant "entered into any agreement with anyone to commit the offense of robbery and/or burglary of a building."

First, under the law of parties, the State was not required to prove that appellant himself caused Garcia's death. Instead, the evidence must have been sufficient to show

5

that although the offense was committed by the conduct of another person, appellant was criminally responsible for that person's conduct. TEX. PENAL CODE ANN. § 7.01(b), (c); Hayes, 265 S.W.3d at 678–79. To have been criminally responsible for the other person's conduct, appellant must have acted with "intent to promote or assist the commission of" the offense by soliciting, encouraging, directing, aiding, or attempting to aid the other person to commit the offense. See TEX. PENAL CODE ANN. § 7.02(a)(2).

## C. Pertinent Facts

Ricardo Perez Jr., an investigator with the Mission Police Department, testified that on June 23, 2010, he responded to a crime scene at a home that had been ransacked and where the body of a shooting victim had been found. Investigator Perez stated that on July 9, 2010, appellant and Roxane Hernandez were arrested for drug possession and that he observed a police interview of appellant. According to Investigator Perez, as part of his investigation, he viewed a surveillance video that had been taken on the night of the incident of four masked men arriving at Garcia's home in a black Expedition. Investigator Perez explained that he tried to identify possible suspects who could have been in the surveillance video through "recognition of [their] body posture," the person's "demeanor" when he walked, and the relationship that each suspect had to the other suspects. Based on these considerations and his experience, Investigator Perez became suspicious that appellant was involved in the crime. Specifically, Investigator Perez said, "I said this may be a possible suspect that we're talking to because he's associated with that black Expedition and the arrest with Roxanne Hernandez, who is sister to Jeffrey Juarez." Evidence presented at trial shows that the police considered Juarez "a person of interest" in the crime and eventually arrested him.

6

The trial court admitted into evidence the surveillance video reviewed by Investigator Perez. The video showed four masked men carrying weapons exiting a black Expedition on the night of the offense in the victim's neighborhood. Investigator Perez testified, without objection, that after viewing the video, he believed "it is [appellant] that's being the driver that exited the driver side of the Expedition" and that the passenger is Angel Falcon. Evidence shows that Falcon had also been arrested. Investigator Perez stated that the police could not identify the other two men. The prosecutor asked, "Okay. How do you know that it's [appellant] in the video?" Investigator Perez replied,

> When I first came across him, when he was arrested in Pharr, he was brought to our police department. And looking at the surveillance video, when he's walking out from the jail cell, in the video you see the driver as he walks like a cool walk, and he grabs his crotch area. [Appellant] had that cool walk, grabbing his crotch area. And that's what got my attention right away. So, I started, you know, I started to build that he was a possible suspect and driver.

> We also found that there was blood on inside the Expedition. And I noticed that he had a healing cut, a little small cut on his hand. I don't remember if it's the right or left. And I know we photographed it because it was of interest to me that he had a cut and that there was blood in the vehicle. . . .

> . . . .

> Based on the observation, my observation of spending a little time with him, talking to him, looking at the video, knowing that there was blood in the Expedition, knowing that he had a cut, all these things, they're building blocks for me. And the demeanor and posture. And even though he's a masked individual, but you look at the structure, the body structure, and that led me to believe that he's the driver. He's in possession of that Expedition. Because he has borrowed it from the mother, the mother of the girlfriend. That's what made me believe that it's him. There's no doubt to me it is him.

> Those are the information that I have that leads me to believe it is him.

7

Evidence was presented that on July 11, 2011, before he was arrested for Garcia's murder, appellant called his girlfriend, Laurie Aleman, from jail on several occasions and discussed the murder of Garcia.[1] During these telephone calls, which were recorded and admitted into evidence, appellant asked Aleman to make "three-way calls" to several people to discuss Garcia's murder.[2] Transcripts of the phone calls were also admitted into evidence. During one conversation with Aleman, appellant stated, "I need you to do me some three-ways and I need a, uh—damn it, babe, I'm stressing over this f***ing cause. [I]t's going to be hard to beat it, babe." Appellant said, "[I]t's going to be hard to beat it. They got my f***ing blood [unintelligible]." Laurie asked, "Is that the [unintelligible] they used," and appellant replied, "Yes." While she was testifying, the prosecutor asked Aleman if she could explain what was unintelligible in question she asked Aleman. Aleman clarified that she had asked appellant "about the truck they used." During the call, appellant told Aleman that he anticipated receiving a one-year sentence for one offense that he had committed, presumably the drug offense, but that he was stressed out about another unnamed offense. The evidence established that prior to this call to Aleman, appellant had recently been interviewed by police regarding Garcia's murder.

Aleman asked appellant, "You are—you really think that's the only thing you're gonna get," and appellant responded, "But Torch is gonna take it. He's gonna take the blame, you know, so I'll be clean. . . . The only thing is right now they're not charging me for that other thing, but I know tomorrow, hopefully I don't—but I know they're gonna come

---

[1] As previously mentioned, appellant was in jail after police arrested him with Hernandez for the drug offense.

[2] During the conversations, the speakers used explicit language. We are unable to remove many of the explicit language because doing so may affect the context of some of the conversations.

8

charge me." During the call, appellant told Aleman that "it's a big ass charge, and then if I get guilty babe, forget it, they're going to give me life," and Aleman replied, "But it wasn't you." Appellant said, "I know but because it has my blood, I've been in situations like this [unintelligible] I didn't do shit babe, but because it has my blood, I don't know what the f*** this bitch did."

In these recorded calls, appellant asked Aleman to call a man referred to as "Coco" and another man referred to as "Edward." Aleman called Edward with appellant on the line. Appellant informed Edward that he was in jail. During the discussion, Edward indicated to appellant that "it got all f***ed, bro" and "you are gonna beat them." Appellant responded, "I know, I'm gonna beat them bro, it's just that it's the, the G ride, they're getting DNA from it and I have—." Again, appellant is referencing the DNA evidence found in the truck used in Garcia's murder. Appellant told Edward that "since [he] had gotten into a fight, [he] had blood in the truck and now they are going to try to f*** me." Appellant said, "F***ing Coco I don't know what, I'm calling him and he doesn't answer, bro. Look buddy, my, my time is running out, I'll probably give you a—." Edward asked, "What do you want me to do, bro," and appellant replied:

> Look, I need you to call Coco, bro tell him to answer the f***ing phone, look, the toys I had already told Coco to bury them, bro, to get one for him—the John Wayne and suddenly [unintelligible] one, one shotty, bro, and the rest to bury them, bro, because, uh, and have them take the serial numbers off of them, buddy. . . . Buddy, if they catch someone with those serial numbers, bro, they're gonna let them have it, bro. . . . I'm telling you. And the Baretta, bro, you have to tear it apart. . . . The Baretta you have to melt it down, bro.

Edward then called Coco on his three-way line with appellant on the other line. Appellant informed Coco that his phone time was running out and instructed him to answer his phone when appellant's girlfriend called him. Appellant said, "Hey, my, my

9

chick is going to call you in a while, bro, to, to give you stuff, to see where you can get rid of it." Coco stated, "Yes, I know, I want her to know that." Appellant said, "—all right, I need you. Tuerca is getting out in a week. In [a] while my chick is going to call you to give you stuff bro, and get rid of it wherever you can, bro, all right. . ... You know how to do it, bro. Point three, everything bro, everything, everything for, pure profit. I love you bro, take care. Hey, the toys, don't give those to the bros. Take the serial numbers off of them and stash them." Coco stated that he would follow appellant's directions.

Appellant asked Aleman to call a friend named "Jasmine," later identified as a witness for the State, Jasmine Pauline Gonzalez.[3] Aleman complied. Jasmine informed appellant that Jasmine's mother, later identified as Jessica Gonzalez, had been arrested. Jasmine informed appellant that "[e]verybody's taking a lot of shit in here, blaming it on me." She stated that she had already given her statement to the Mission Police Department. Appellant told Jasmine that he "needed her" help and asked her to make another statement to the police. Jasmine replied, "Yeah, but I already let—I already did my statement. How can I renew my statement and lie about my statement?" Appellant replied, "Why did you f***ing do a statement? You already knew not to do a statement." Jasmine said, "They—[appellant], the first day that they came 'cause of the truck, they were gonna arrest my mom, my grandma for that shit." Appellant reiterated that he "needed" Jasmine's help, and told her that he was not "gonna come out." Jasmine responded, "Well, what do I do now? Now I go have to go back and lie?" The following colloquy occurred:

> [Appellant]: No, just tell them that it was—you were just with him for like two—you were just with him for two weeks.

---

[3] For purposes of reader ease, we will refer to her by her first name, Jasmine.

10

Jasmine: Well, you too. Why the hell do you have to also f*** around, [appellant].

[Appellant]: Jasmine, don't do it like that. It wasn't even me, it wasn't even me, hell with that, don't be saying shit like that.

Jasmine: Oh.

[Appellant]: I didn't do that f***ing shit.

Jasmine: I know you didn't.

[Appellant]: Don't do me like that, Jasmine, you know that if I'm f***ing found guilty for that shit, I'm not gonna f***ing come out, never. Hey.

Jasmine: What?

[Appellant]: I need you Jasmine, man, you know that I don't f***ing—man, you know I need you. I need you, I need you to be strong.

. . . .

[Appellant]: Everything's gonna be all right. Everything's gonna be all right, but you have to tell them the truth. Jasmine—

Jasmine: I know.

[Appellant]: You need to tell them that your guy, would use the truck too.

Jasmine: I know, I already know, and he did use it.

[Appellant]: Jasmine, damn it, Jasmine, I need you more than ever. I know that your mom is in this shit, but you know that if I get out, Jasmine, I get out and man, I'll, I'll, I'll owe you my . . . life, I'll do anything—

Jasmine: No [unintelligible] you don't need to give me nothing, I already see how it is, I already see how you are, but I'll try to do something, I'll—

[Appellant]: What do you mean how I am?

Jasmine: Yes, taking other f***ing [women] in my truck. No it's cool—

11

[Appellant]    Who the f*** had other [women]?

Jasmine:    —everything is cool [unintelligible]."

[Appellant]:    Hey, they didn't stop me with another chick.

. . . .

Jasmine:    I'm down with you, I'm down with you, I'll do anything [unintelligible]

. . . .

Jasmine:    I'm trying to do my . . . best, [appellant]. I'm trying. I'm trying. I want to go over there, and I'm scared that they're gonna take me in 'cause I'm lying. I'm you know—I don't know what to do.

[Appellant]:    No, Jasmine. You're not lying. You're just telling them the truth. Just, look Jasmine, Jasmine, you're mom has— Jasmine you know how to run this shit, all right.

. . . .

You know. You just say it crying, start crying, that hey, that you were with this guy, but you never thought nothing of him, the guy was, you know from Mexico, and all—all of a sudden he just came back and he gave you the truck [unintelligible] clean and whatever the f*** and he left.

Jasmine:    And why, and why, why they're giving you that for?

[Appellant]:    Because, Jasmine, 'cause my DNA is on the f***ing truck.

Jasmine:    On the truck, but it's like maybe you were—you punched [Aleman] or something.

[Appellant]:    I know, it did, remember, but I don't know why they're doing it to me.

Jasmine:    Your hand was bleeding when the—

[Appellant]:    Yes, but do they know that? They do not know that, Jasmine.

Jasmine:    That's why I said, to my . . . statement, that's what I was trying to say, I mentioned [Aleman], I thought that it was that—that

12

you punched her and you—you had a cut and you bleed, and I don't know what. I said that.

[Appellant]: But they told me that you guys said that only I drove the truck.

. . . .

[Appellant]: Jasmine I need you, Jas—that's why I gave you—I knew well that you shouldn't give a . . . statement.

Jasmine: No, I didn't know that. For real, I didn't even know what was happening, they were coming to arrest my grandma. We were at the bar, they came over here, and they were arresting my grandma for—for attempted murder, capital murder, whatever. And my mom, grandma was all scared like they—they already wanted to arrest her. She was all scared—she was like—No, this is my daughter's truck. So, I came over here, and then they wanted—oh well we need to go in—they—they had—I had to go in that day, if not they were going to arrest me.

. . . .

[Appellant]: I just need you to help me out on this on Jasmine. Please, you know if I'm found guilty on this shit, I'm never gonna come out you know, and I don't deserve this shit Jasmine—

. . . .

Jasmine: I ain't gonna be weak, yo, I'm not being sad, 'cause I'm just going to go back over there and I'm gonna say whatever I gotta . . . say. I know, okay.

[Appellant]: Jasmine, you know that I wouldn't, I would never . . . do shit like that.

. . . .

[Appellant]: But are you going to help me out?

Jasmine: I'm trying, [appellant], I want to go back—

[Appellant]: Jasmine, are you going to help me out? Tell me the truth, 'cause you don't sound too . . . confident.

13

Jasmine: Yes, I am [appellant].

[Appellant]: You're gonna let me . . . stay in here or what?

Jasmine: No.

[Appellant]: You don't sound too confident, Jasmine.

Jasmine: [Appellant], I'm gonna try, I'm gonna try [unintelligible] it's 'cause I don't know how to say it, I don't know how to say it but—

[Appellant]: Look—look Jasmine, this is what you're—Jasmine, this is what you're going to say, like start crying—

Jasmine: I already know—

[Appellant]: Start crying—

Jasmine: That's my boyfriend Felix, I don't know what—

[Appellant]: There you go, start, start, you know, just tell 'em the truth you know, tell 'em like, that you—you were with him, but you—it was nothing serious you know that, you would lend it to him, and that your mom didn't know, and whatever the f***.

Jasmine: See that's why I'm . . . mad—

[Appellant]: It was around—

Jasmine: I needed this, I needed this shit . . . from the beginning to know this shit. It's—that's why if you knew something was up, why don't you tell me anything—

[Appellant]: Baby, I was . . . locked up, they wouldn't let me use the phone.

Jasmine: No, I know, but like before like—

[Appellant]: Nothing was—

Jasmine: Why don't you tell me this before like, so I could know, you know what I mean? If anything happens, I know what to say in the beginning. You know—

[Appellant]: I'm sorry. I'm sorry—

14

Jasmine:        I didn't know nothing about this, babe—

[Appellant]:    I'm sorry.

Jasmine:        —I don't nothing

[Appellant]:    Hey.

Jasmine:        You know, I didn't know what to go, what the f***ing statement.
                You know how . . . stupid I am. I didn't even know what the
                f*** that shit was.

                . . . .


[Appellant]:    You're not gonna let me stay in here, right?

Jasmine:        No, I'm not.

[Appellant]:    All right. Hey, Jasmine, you know when I come out, man, I'll
                owe you guys whatever man, I'll . . . do whatever for you guys,
                you know that I will, I'm good, I'm worth it, all right?

                . . . .


[Appellant]:    Wait, wait. Let me talk to you, let me talk to you. Hey,
                Jasmine, look, they don't know shit, babe, they don't—

                . . . .


[Appellant]:    You know how the . . . show runs. They don't know anything.
                They don't know shit, and, there's not—we—there's nothing
                in—there's no way we can help them, why? 'Cause we didn't
                do shit, all right?

Jasmine:        All right.

[Appellant]:    But you, Jasmine, if you can help out, just tell them that stuff,
                what Mitzi told you, but you need to get the story straight. You
                need to talk to Mitzi, make every—make everything—

Jasmine:        That's why I told her, I told her, I'm—come over here and let
                me talk to you. Let me talk to you in person.

15

[Appellant]: And what did she say?

Jasmine: 'Cause I can't be doing—

[Appellant]: She said she could do it. She'll go over there.

Jasmine: Yeah I know, but right now I'm going to the Mission P.D.

[Appellant]: What's more tell . . . Mitzi to take you. Tell Mitzi if she could take you.

. . . .

[Appellant]: You already, get everything straight, get the address, around, it was around June 20th, June 15th, June 20th that you were with this guy, you were with him for two weeks, one day he arrived, he came back with the truck real clean and, and he left, he bought you the new clothes, all right? He had a lot of money. Jasmine.

Jasmine: All right, I'm listening.

[Appellant]: Don't let them break you. Jasmine. Don't let them break you.

. . . .

[Appellant]: They're trying to scare you. Why are they—why are they going to take you, they don't got no reason to, but they're gonna. They're gonna, you know. They're gonna scare you like, oh, we this, we know this, we know that, bullshit Jasmine. Stick to the mother ****ing plan, all right?

. . . .

[Appellant]: Hey, I got a family too, all right? Please make your story straight. Talk to Mitzi, get everything straight, all right?

Jasmine: All right.

[Appellant]: Hey, get everything straight, but please, Jasmine, don't let me down, please, Jasmine.

16

In a subsequent conversation with Aleman, appellant said, "[B]abe, if my blood wouldn't have gotten there, I might have made, but they're going to do lab work all over it, they're gonna—" Appellant also stated that he believed that Jasmine and her mother would testify against him. Appellant instructed Aleman to call "Mitzy" and to tell Mitzy "to give [Aleman] information about Jasmine." Appellant said, "tell Mitzy to keep telling Jasmine to please help me, to please help me, to please help me, to keep calling her and telling her please help me for, for them not to bullshit her, that I need her, all right?" Appellant told Aleman to talk to Jasmine and to tell her that when appellant got out of jail, "we'll give her a lot of money, and we'll help her out in whatever, tell her please that I have a family that if I get charged with this, I'm never going to come out." Appellant said,

> Right now I'm going to write to you. Hey, and tell Mitzy that, to, if Jasmine already has a name and where he's from. Tell Jasmine to get her . . . story straight babe, I need Jasmine, baby, I need her babe, you know she's the only one that can help me out. Her and her mom, her mom is down for me babe. Just tell her not to . . . for them to be strong, not to let them bullshit her, not to sign no papers—.

At trial, Jasmine testified that she, her mother, and appellant were the only people who drove the vehicle used in Garcia's murder. According to Jasmine, she dated appellant in June of 2010. Jasmine stated during that time, that she lent the vehicle to one other man on one occasion, but she was present in the vehicle at the time. At no time did Jasmine lend the vehicle to someone other than appellant without being present in the vehicle. Jasmine stated that "sometimes" she lent the vehicle to appellant and did not accompany him. Jasmine could not recall how many times she loaned the vehicle to appellant while she was not also in the vehicle. Jasmine testified that on July 9, 2010, appellant was in possession of the vehicle. Jasmine explained that although appellant was being held by the Pharr Police Department, she "went looking for him" on that date

17

and found the vehicle at appellant's mother's house. According to Jasmine, she observed many police officers at that location.

Jasmine testified that when she spoke to appellant on the phone, he asked her to lie "about a guy using her truck." Jasmine acknowledged that she told appellant she would tell the police what appellant asked her to say; however, Jasmine never told police what appellant asked her to say because she "had already left a statement." On cross-examination, Jasmine stated that the vehicle belonged to her mother, Jessica Gonzalez.

On July 12, 2010, Alejandro Madrigal Jr., a forensic scientist with the Department of Public Safety Crime Laboratory, assisted the Mission Police Department in collecting evidence from the vehicle used by the suspects during the commission of the offense. The vehicle was a black 2000 Ford Expedition. Madrigal took swabs of what appeared to be blood located on the driver's side area of the vehicle for DNA testing. Madrigal then compared appellant's DNA with that found in the vehicle. Madrigal explained, "The items that we went over and we compared was AM6-A, which was jeans, the Guess jeans, AM-7, which were the Dristan jeans, AM-10, which was the swabbing from the steering wheel. And AM-14, which was the driver's side center console." Madrigal stated that "[t]he findings were that the DNA recovered from the items were consistent with the DNA profile of [appellant]" and appellant "cannot be excluded as a contributor of these profiles." According to Madrigal, "the probability of selecting an unrelated person as a random who could be the source of these profiles [found in the vehicle] is approximately 1 in 36.28 quintillion for Caucasians. 1 in 4.230 quintillion for Blacks. And 1 in 2.163 quintillion for Hispanics." Madrigal concluded "[t]hat to a reasonable degree of scientific certainty, [appellant] is the source of those [blood] stains" found in the vehicle.

18

Rolando Mendoza, a Mission Police Department crime scene technician, testified that he executed a search warrant of a residence located at 207 Camino Real, Apartment 6 on July 13, 2010. Mendoza recovered, among other things, a black tactical shotgun "Remington 870" with serial number "[A]B796139[M]."[4] The prosecutor showed Mendoza State's Exhibit No. 15 and asked, "Can you verify if it is, or is not the same serial number? Mendoza replied, "It is the same one, ma'am." State's Exhibit No. 15 is a receipt of Garcia's purchase of a weapon "REM 870" with serial number AB796139M. In addition, regarding the gun found by police, Adrian Garcia, the victim's brother, stated, "I'm certain one hundred percent that's my brother's weapon." Adrian Garcia explained that the victim's gun was unique because it was custom-made and "it is very rare to see" a gun with the "features" that this particular gun had. Guadalupe Garcia, the victim's other brother, stated that the gun belong to the victim.

Sergeant Jody Allen Tittle, a police investigator with the City of Mission police department, testified that he confirmed that the serial number of the black shotgun found at the Camino Real apartment matched a gun purchased by Garcia. Sergeant Title also testified that the vehicle in appellant's possession was the same vehicle used in Garcia's murder. In addition, Sergeant Tittle described State's Exhibit Number 35-B as a size "large" dark brown glove recovered at the crime scene. The prosecutor then asked Sergeant Tittle to observe State's Exhibit Number 70-A, another size large dark brown glove that Sergeant Tittle stated matched the glove found at the crime scene. Sergeant Tittle did not know where State's Exhibit 70-A was discovered. However, Madrigal

---

[4] The reporter's record indicates that Mendoza testified that the serial number was "8B796139N." However, Mendoza also testified that the serial number was identical to the serial number listed on State's Exhibit Number 15, which shows the serial number as being AB796139M.

testified that he found the brown glove identified as State's Exhibit 70-A in the glove compartment of the Expedition.

Vicente Ochoa Jr., an investigator with the Mission Police Department, testified that he had been assigned to work on this case on June 25, 2010 and that on July 12, 2010, he began his investigation concerning appellant's recorded phone calls from the county jail. Investigator Ochoa stated that he listened to nine phone calls and attempted to determine who the phones were registered to and to get "pings" on the GPS location of the phones from the phone service providers. Investigator Ochoa clarified these "pings" would help "locate . . . where these people were at in regards to, since they were possibly getting rid of evidence." According to Investigator Ochoa, they received a "hit" to one of the numbers at the location of "Camino Real, 200 block in San Juan," Texas. Investigator Ochoa clarified that two numbers pinged to the 200 Camino Real area, which included the phone number used by a man referred to as Coco.

Based on this information, the police set up a surveillance of the Camino Real area. Investigator Ochoa stated, "In the early morning we see a male subject come out of the area side of the apartment. We make contact with him. He identifies himself as Coco. And we get his correct name as being Juan Briones." Investigator Ochoa testified that they made "the link that the same person on the phone calls [with appellant] from the jail that we got mentioned is a Coco. . . . We realize that it's the same person from there." According to Investigator Ochoa, the police then transported Coco to the police department, and Investigator Ochoa assisted in the execution of a search warrant at 207 Camino Real. Investigator Ochoa testified that they found several weapons at this location, which included a "distinctive shotgun" that was located under the bed.

20

Investigator Ochoa stated, "One of the weapons was recovered, which was a tactical shotgun, through the investigation we discovered was a weapon that was purchased by the victim at the Armory store in McAllen[, Texas]. Serial number did match up to the weapon that [the victim] purchased."

Investigator Ochoa observed a body search of appellant that was taken after blood was found in the vehicle used in the crime. Evidence was presented that appellant resisted the body search and that he "put up a pretty good struggle." During this body search, the police photographed a "healing cut" that appellant had on his hand. Regarding the investigation of appellant's connection with the offense, Investigator Ochoa said,

> We're able to determine that there is some items at the crime scene that match up to [appellant], as far as his right hand, a figurine that was broken when the suspects crossed over the fence in order to gain entry into the property, the vehicle being driven by [appellant], and blood found inside the vehicle.

On cross-examination by appellant's trial counsel, Investigator Ochoa explained that the victim had a "rod iron fence" with a decorative figurine welded on top, which the police found next to the fence. Investigator Ochoa stated that the vehicle used by the suspects was linked to appellant because "[h]e's the person supposed to be driving it, the vehicle" and that "[i]n the video [appellant] matches the description of the driver." Investigator Ochoa stated that he believed the video showed that the driver of the vehicle matches appellant "[b]y his body build." Investigator Ochoa testified that from what he "gathered from [Jasmine's mother Jessica], she says that [appellant] had the vehicle" when the crime occurred and that Jessica "told" Investigator Ochoa that appellant "was the one using it."

21

## D. Analysis

Appellant argues that the evidence is insufficient to support the jury's finding that he committed the charged offense. However, we disagree with appellant, and we agree with the State that the evidence, as set out below, supports the jury's verdict.

During his phone conversations, appellant did not explicitly state that he was discussing Garcia's murder. However, throughout these conversations, appellant alluded to facts that the evidence at trial established were connected to Garcia's murder. These facts included appellant's concern: (1) about DNA from his blood that police discovered in the vehicle used by the suspects the day after appellant talked to Aleman; (2) about weapons that were in the possession of a man referred to as "Coco"; and (3) that he would receive a life sentence for the "other thing" that he had not been charged with that was "a big ass charge."[5] From this evidence, the jury could have reasonably found that appellant had knowledge of details of Garcia's murder because he was somehow involved especially given appellant's concern that he would receive a life sentence for Garcia's murder and his concern that his DNA was located in the vehicle used by the assailants and the fact that the police located one of the stolen weapons in Coco's possession based on appellant's phone call to Coco. See Ethridge, 795 S.W.2d at 285 (explaining that attempts to conceal or destroy contraband is sufficient evidence of "guilty knowledge"). The jury could have also taken into consideration appellant's prediction that the police would find his blood in the vehicle to use against him as an indication that

---

[5] We must view the evidence in the light most favorable to the jury's verdict; thus, to convict appellant, the jury must have determined that the vehicle appellant used was the same vehicle used to commit the offense, which is supported by evidence that the vehicle used during the commission of the offense had the same damage to the side step as the vehicle found in appellant's possession. See Jackson, 443 U.S. at 319; see also Brooks, 323 S.W.3d at 898–99.

22

appellant was involved because the police would discover his DNA and link him to crime scene. *See Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) ("A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt. It is consequently a well[-]accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged.") (internal quotations omitted) (citing Ray, TEXAS PRACTICE VOL. 2, LAW OF EVIDENCE, § 1538, at 242 (1980)). In addition, appellant told Aleman "****, babe, if my blood wouldn't have gotten there, I might have made, but they're going to do lab work all over if they're gonna." From this evidence the jury may have found that appellant felt that without the blood evidence the police would not be able to link him to the crime. Moreover, from this, the jury may have inferred that appellant believed that the blood in the vehicle would somehow inculpate him in Garcia's murder. Thus, viewing the evidence in the light most favorable to the jury's findings, we conclude that the combined force of the above-citied evidence leads to a reasonable inference that appellant left the blood in the vehicle at the time that the crime occurred. *See Hooper*, 214 S.W.3d at 15 (noting that, although the fact-finder is not permitted to reach conclusions based on mere speculation, "direct evidence of the elements of the offense is not required," the fact-finder is "permitted to make reasonable inferences from the evidence presented at trial," and circumstantial evidence "is as probative as direct evidence" in establishing guilt and stating, "[u]nder the *Jackson* test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial").

The evidence shows that when appellant called Coco, he asked him to dispose of some "toys" and to ensure that these "toys" lacked serial numbers. The evidence presented at trial established that Coco had possession of one of Garcia's customized rifles. From this evidence, the jury could have reasonably inferred that when appellant mentioned "toys," he was discussing the guns that had been stolen from Garcia's home and that appellant had authority to tell Coco what to do with the weapons. The jury could also have reasonably inferred that appellant wanted Coco to dispose of the weapons because appellant feared that the weapons would be linked to him, and he wanted to destroy any evidence that may have been on those weapons, such as fingerprints, to hide his involvement. In addition, the jury may have reasonably inferred that appellant wanted to either destroy or conceal the guns because he was involved in Garcia's murder. *See Ethridge*, 795 S.W.2d at 285; *Gordon v. State*, 735 S.W.2d 510, 517 (Tex. App.—Houston [1st Dist.] 1987), *aff'd*, 784 S.W.2d 410 (Tex. Crim. App. 1990) (providing "that appellant demonstrated a guilty mind by attempting to destroy incriminating evidence"); *see also Cueva v. State*, 339 S.W.3d 839, 881–82 (Tex. App.—Corpus Christi 2011, pet. ref'd) ("Any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a consciousness of guilt may be received as a circumstance tending to prove that he committed the act with which he is charged.") (citations omitted).

Moreover, the jury could have reasonably found from this evidence that appellant had authority to determine how the men dealt with the guns and infer that because appellant took a leadership role in the destruction of the evidence, he must have participated in the execution of the home invasion by soliciting, encouraging, directing, aiding, or attempting to aid another person in committing the crime in this case. *See* TEX.

24

PENAL CODE ANN. § 7.02(a)(2). The jury could have reasonably found from the evidence that Coco had already disposed of some of the guns taken from Garcia's residence because appellant stated, "I already told Coco to bury [the guns]" and although four guns were missing from Garcia's home, Coco only had one gun at the Camino Real property.

During his conversation with Jasmine, appellant asked her to change her statement to police. And, Jasmine testified that he wanted her to lie about lending her car to someone else. During the conversation, appellant instructed Jasmine to "just say it crying, start crying" and to tell the police that the man is from Mexico and "that all of a sudden he just came back and he gave you the truck . . . clean and whatever the f*** and he left." Appellant told Jasmine that the police indicated that she said in her statement that she only lent her truck to him and that she needed to go back to the police and tell them that she had lent her truck to another man around the date of Garcia's murder and to tell the police that her mom did not know that she had lent the truck to someone other than appellant. Jasmine responded that she was angry because she needed this information "from the beginning to know this shit" and asked why appellant had not told this earlier so that she knew "what to say in the beginning."

Appellant claimed that if Jasmine changed her statement that he would not be kept in jail and stated, "look, they don't know shit. . . ." Appellant advised Jasmine to "get everything straight" and that she needs to "get the address, around, it was around, June 20th, June 15th, June 20th that you were with this guy, you were with him for two weeks, one day he arrived, he came back with the truck real clean and, and he left, he bought you the new clothes, all right?" From the foregoing evidence the jury could have found that appellant had a consciousness of guilt due to his involvement in the murder. *See*

25

*Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are also probative of wrongful conduct and are circumstances of guilt.") (citing *Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) ("In addition, this Court has recently recognized that a fact finder can consider a defendant's untruthful statement (in this case two "implausible" and inconsistent statements by appellant) as affirmative evidence of guilt.")); *Cueva*, 339 S.W.3d at, 882 ("[A]ttempts to tamper with a witness, and any criminal act designed to reduce the likelihood of prosecution, constitutes evidence of 'consciousness of guilt' on the part of the defendant.") (citations omitted); *see also Garza v. State*, 172 Tex. Crim. 468, 358 S.W.2d 622, 623 (Tex. Crim. App. 1962) (explaining that the efforts of an accused to induce a witness to testify falsely may be shown as indicating a consciousness of guilt).

Finally, Investigator Perez gave his opinion that the driver in the video was appellant and the jury observed that video. Investigator Perez based his opinion on the distinctive way that appellant moved and walked. He also testified that all of the circumstantial evidence pointed to appellant's involvement in the crime.

Although the majority of the evidence in this case is circumstantial, viewing the evidence in the light most favorable to the jury's verdict, we conclude that the cumulative force of all of the surrounding facts and incriminating circumstances is sufficient to support the jury's conclusion that appellant, acting with intent to promote or assist the commission of the capital murder of Garcia, solicited, encouraged, directed, aided, or attempted to aid the other person to commit the capital murder. *See* TEX. PENAL CODE ANN. § 7.02(a)(2); *Thomas*, 444 S.W.3d at 8; *Winfrey*, 393 S.W.3d at 768; *Ethridge*, 795 S.W.2d at 284–85;

26

*Torres v. State*, 141 S.W.3d 645, 662 (Tex. App.—El Paso 2004, pet. ref'd) (holding, in a circumstantial-evidence case, that the cumulative force of all the surrounding facts and incriminating circumstances was sufficient to support the jury's conclusion of guilt); *Mashburn v. State*, 272 S.W.3d 1, 14 (Tex. App.—Fort Worth 2008, pet. ref'd) (explaining that the trier of fact may infer a culpable mental state from the acts, words, and conduct of the accused and may also infer intent from acts that indicate a consciousness of guilt.). Therefore, we conclude that under the law of parties, the evidence is sufficient to support appellant's conviction. We overrule appellant's first issue.

## II.   ADMISSION OF VIDEO

By his second issue, appellant contends that the trial court erred by admitting the surveillance video of the perpetrators entering Garcia's home. Specifically, appellant argues that pursuant to rule of evidence 403, the video "'is highly prejudicial' in that it plays to the prejudices of the jury by using fear as a tactic to confuse the jury" and that any probative value in this evidence was slight at best." Appellant points out that the men in the video wore masks and claims that "no evidence was adduced that ANY of the persons in the video were identified."

We review the trial court's decision to admit evidence for a clear abuse of discretion, and we will not reverse the judgment if the decision lies within the zone of reasonable disagreement. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008). Texas Rule of Evidence 403 permits a trial court to exclude relevant and otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403 (1998,

27

superseded 2015).[6] Admissibility of the evidence is favored under a rule 403 analysis, and "the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (en banc). "[T]he plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). Under rule 403, the trial court must only exclude evidence that causes "unfair" prejudice, which refers "to relevant evidence's tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged." *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).

The video's probative value was that it showed the jury the vehicle that was used by the suspects during the commission of the crime to aid the jury in its evaluation of whether the State proved that it was the same vehicle that appellant possessed. At trial, evidence was presented that the vehicle appellant possessed and that Jasmine had loaned him had damage to the side step that matched damage to the vehicle used in the commission of the crime. Thus, the trial court could have determined that the jury needed to view the video in order to make this determination.

Appellant argues that the video was prejudicial because it was used as a "scare tactic" and no evidence was presented that he was present during the commission of the offense. However, to find unfair prejudice the video must have had a tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged. *Mechler*,

---

[6] The Texas Supreme Court and Texas Court of Criminal Appeals amended rule 403 to become effective on April 1, 2015. It now states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

28

153 S.W.3d at 440. And, although the men in the video wore masks, evidence was presented that the driver of the vehicle had appellant's body type, demeanor, and walk. Moreover, at trial, the victim's son testified in detail about what occurred that night in his home. Those details were likely much more disturbing to the jury than the video which merely shows the vehicle parked in the street and that four masked men, some with guns, exited the vehicle. The video also shows that there was damage to the passenger side step which matched damage to the side step on the vehicle appellant possessed. Thus, we cannot conclude that the video had the tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged. *See Mechler*, 153 S.W.3d at 440. Accordingly, the trial court did not abuse its discretion in admitting the video over appellant's rule 403 objection. We overrule appellant's second issue.

## III.    CONCLUSION

We affirm the trial court's judgment.

/s/ Rogelio Valdez
Rogelio Valdez
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
14th day of May, 2015.

29